# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| KEVIN WOOTEN, an individual<br><br>*Plaintiff,*<br><br>v.<br><br>NETFLIX, INC., et. al.,<br><br>*Defendants.* | Case No.: 1:20-cv-05166-TCB |

## PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION OF DEFENDANTS' MOTION TO DISMISS

**I.**      **Introduction**

Wooten seeks relief for Defendants' copyright infringement of his novel *Pennywise: The Hunt for Blackbeard's Treasure!* (the "Novel") after Defendants wrote, produced, and released the substantially similar television series, *Outer Banks* (the "Series"). Defendants seek a premature dismissal based on a cursory dissection and gross oversimplification of the Novel by improperly characterizing the Novel's individual elements as unprotectable without regard to Wooten's original selection, development, and creative arrangement of the Novel's plot, sequence of events, characters, mood, setting, and pace, which render them protectable. Even if the Court finds an infringement determination is ripe at this stage, the substantial similarities are sufficient to survive a motion to dismiss. Accordingly, Defendants' Motion to Dismiss should be denied.

II.    **Legal Standard**

Rule 8(a) provides that "a pleading requires a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Claims for copyright infringement may be pled under the general pleading requirements of Fed. R. Civ. P. 8." *Downtown Sports, Inc. v. Legacy AH, LLC*, No. 1:08-cv-3842-JOF, (N.D. Ga. Apr. 14, 2009); *See also, Potter v. Cartoon Network LP, LLLP*, No. 1:06-CV-2076-JEC (N.D. Ga. Aug. 21, 2007). To state a claim for copyright infringement, a plaintiff must show (1) ownership of a valid copyright and (2) unauthorized copying of protected elements of the copied work. *Lott-Johnson v. Studio 620, Samuel French, Inc.*, No. 1:11-cv-2205-WSD (N.D. Ga. Aug. 8, 2011); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Suntrust Bank v. Houghton Mifflin Co.*, 268 F. 3d 1257, 1266 (11th Cir. 2001). "At the motion to dismiss stage, an allegation of ownership of the copyright at issue alongside proper registration is enough to satisfy the first prong." *Wisser v. Morris Visitor Publ'ns*, LLC, No. 118-150 (S.D. Ga. Mar. 17, 2020). "Plaintiff may fulfill the second element by pleading enough facts to demonstrate a defendant's potential access to and production of substantially similar works." *John Mills, LLC v. Finley*, No. 2:19-cv-

2

275-RWS (N.D. Ga. Apr. 14, 2020). The Eleventh Circuit determined that "a reasonable opportunity to view" constitutes evidence of access. *Herzog v. Castle Rock Ent.*, 193 F.3d 1241, 1249 (11th Cir. 1999). "Dismissal is only appropriate if plaintiffs have not pled facts supporting each material element of their allegations." *Potter*, (N.D. Ga. 2007).

## III.   <u>Argument</u>

### A. <u>Substantial Similarity Analysis is Premature at the Motion to Dismiss Stage.</u>

Defendants ask the Court to determine infringement based on a premature substantial similarity analysis between the Novel and the Series (collectively, the "Works") prior to discovery. *See* Dkt. No. 7, Ex. A, Defendants' Memorandum of Law in Support of Motion to Dismiss ("Defendants' Motion"). Although Defendants' Motion is labeled as a Rule 12(b)(6) motion, Defendants are not seeking dismissal based on Wooten's failure to state a plausible claim. In fact, Wooten has exceeded the Rule 8(a) pleading requirements by: (1) producing his copyright registration (*See* Compl., Ex. A); (2) asserting that Defendants had a reasonable opportunity to view the Novel and therefore had access (Compl. ¶¶ 18-20, 38, and Ex. B); and (3) producing a meticulously detailed chart and analysis of 46 substantial, and even striking, similarities between the Works (*See* Compl., Ex. A and Ex. C).[1] Defendants are instead attempting to hastily

---

[1] *Alfred v. Walt Disney Company*, 821 Fed. Appx. 727, 729 (9th Cir. 2020) (finding that "at this stage of the litigation, it is difficult to know whether such elements [the two

pressure the Court into an infringement decision, which would be premature without

addressing the remaining factual disputes, including Defendants' access and whether

copying actually occurred.[2] *See* Compl. ¶¶18-20, 38, and Ex. B. Tellingly, neither the

Northern District of Georgia nor the Eleventh Circuit has ever dismissed a case based on

substantial similarity at the motion to dismiss stage. Indeed, the Eleventh Circuit has

never directly addressed whether a district court can determine infringement based on

substantial similarity at the motion to dismiss stage. Notably, this Court recognizes the

"well-established proposition that issues of substantial similarity are fact issues generally

left for jury resolution." *Original Appalachian Artworks v. Schlaifer Nance*, 679 F. Supp.

1564, 1574 (N.D. Ga. 1987).[3]

Additionally, the Defendants' reliance on *Sieger* is misguided because that case

involved copyright infringement of architecture, for which a heightened level of analysis

is required because the "average observer" is not average at all; rather "the 'average

observer' is one who is fully aware of the law, trained to understand the elements of

---

works share in common generic, pirate-movie themes] are indeed unprotectible material"
and that "additional evidence would help inform the question of substantial similarity").
[2] For purposes of a motion to dismiss, the Court must take the facts in a complaint as true
and construe them in the light most favorable to the plaintiff. *Sieger Suarez Architectural
P'ship, Inc. v. Arquitectonica Int'l Corp.*, 998 F. Supp. 2d 1340, 1345 (S.D. Fla. 2014).
[3] After noting the well-established principle, the court engaged in substantial similarity
analysis at the summary judgment stage, because the case involved complex copyright
claims related to dolls where the copyright was based on a licensing agreement.

infringement and protectable features, with knowledge of architectural designs, and with experience to decide the facts of a given case." *Sieger*, 998 F. Supp. 2d at 1347. The court found that although "the Eleventh Circuit has defined substantial similarity as existing 'where an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work'"[4] here, the court would be more suited to analyze substantial similarities between the architectural works than a lay observer. *Id*. at 1349. To that end, *Sieger* is distinguishable because it involves architectural works and because it cites to Eleventh Circuit case law that solely involves architecture and an analysis of substantial similarity at the *summary judgment* stage. Although other circuits have decided infringement based on substantial similarity of non-architectural works at the dismissal stage, those decisions are non-binding over this Court.[5]

Contrastingly, the case at hand involves non-architectural works, the Novel and the Series, which are both targeted to appeal to young adult audiences. When dramatic works are at issue, substantial similarity requires a quantitative analysis, as well as "the intrinsic test of the response of an ordinary reasonable person, a form of qualitative analysis."[6]

---

[4] *Orig. Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir.1982).
[5] Notably, the Tenth Circuit considered substantial similarity at the motion to dismiss stage for copyright infringement of a novel "*after nearly a year of discovery.*" (emphasis added). *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 940 (10th Cir. 2002).
[6] *Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Co-op.*, 479 F. Supp. 351, 356 (N.D. Ga. 1979) (finding substantial similarity in foundation, story line, material of locale,

Such young adults meet the Eleventh Circuit's definition of the "lay observer" because they are readers and viewers without training or experience in copyright infringement. Given that this case involves non-architectural works that do not require a heightened level of legal copyright knowledge and expertise to analyze substantial similarities, there is no need for this Court to determine non-infringement now because a lay observer can and should determine the substantial similarities.

Moreover, the Eleventh Circuit found that "summary judgment may be inappropriate in certain types of copyright infringement cases." *Intervest v. Canterbury*, 554 F.3d 914, 920 (11th Cir. 2008). In particular, cases where: "(1) because access has been established, the crucial issue is substantial similarity; (2) there may be substantial similarity with respect to the non-copyrightable elements of the two works compared; and (3) as to the protectable elements, there is substantial dissimilarity." *Id.*[7]. Here, while Wooten has alleged access, it has not been established[8]. Compl., ¶ 20. In fact, Defendants have outright denied access, rendering this issue directly in dispute. Defendants' Motion, 8, n. 3. Accordingly, because access is in dispute, this case falls squarely outside of the

---

setting, characters, situations, and relationships, and near verbatim dialogue between a dramatic novel/movie and a comedic musical).

[7] The parties stipulated that defendant had access to the work at issue, so the case turned on substantial similarity. *Intervest v. Canterbury*, No. 07-12596 (M.D. Fla. 2007).

[8] Wooten's Complaint establishes a reasonable inference that Defendants had access. Wooten also reserves the right to further establish access through discovery in this case.

type of case the Eleventh Circuit has recognized as appropriate for summary judgment. Accordingly, if this case is not appropriate for summary judgment without establishing access, it is likewise inappropriate for dismissal.

Additionally, the standard to survive a Rule 12(b)(6) motion is whether the court may draw a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556.[9] Notably, Defendants have not contested Wooten's ownership of the copyright; rather, they focus on the second prong. The second prong entails proof of both factual and legal copying, namely: (1) as a factual matter, the defendant copied portions of the plaintiff's work; and (2) as a mixed issue of fact and law, the copied portions of the work are protectable expressions. *Peter Letterese & Associates, Inc. v. World Institute of Scientology Enterprises, Int'l*, 533 F.3d 1287, 1300 (11th Cir. 2008). "In the absence of direct proof, factual copying may be inferred from circumstantial evidence, either through establishing that the works are 'strikingly similar' …or through 'proof of access to the copyrighted work and probative similarity.'" *Id*. The Eleventh Circuits finds that "a reasonable opportunity to view" constitutes evidence of access. *Herzog*, 193 F.3d at 1249. Further, "[s]triking similarity exists where the items are so similar in appearance that the possibility of independent creation, coincidence, and prior

---

[9] As discussed, a plaintiff states a claim of infringement if he alleges ownership of the copyright at issue, alleges potential access, and produces substantially similar works.

common source are, as a practical matter, precluded." *Collective v. Pucciano*, 247 F. Supp. 3d 1322, 1342 (N.D. Ga. 2017).

Here, the Court may draw a reasonable inference of infringement because Wooten has plausibly pled the elements of infringement by producing his copyright registration (*See* Compl., Ex. A), asserting that Defendants had reasonable opportunity to view the Novel and therefore had access (Compl. ¶¶ 18-20, 38, and Ex. B), and producing a meticulously detailed chart consisting of 46 substantial, and even striking, similarities between the Works (*See* Dkt. 1 Compl., Ex. A and Ex. C). "To require a plaintiff to do more, at the motion to dismiss stage, would be to subject copyright plaintiffs to a heightened level of pleading, something this Court has been strictly proscribed from doing." *ICC Evaluation Serv. v. Int'l Ass'n of Plumbing & Mech. S*, No. 16-54 (EGS)(DAR) (D.D.C. Apr. 17, 2020) (citing *Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610 (S.D.N.Y. 2013)). Thus, this Court should deny Defendants' Motion because Wooten has satisfied the pleading requirements and because dismissal based on substantial similarity prior to discovery is premature and unwarranted.

**B. <u>The Substantial Similarities Consist of Protectable Elements.</u>**

Defendants contend that the Works are not substantially similar because the cited similarities are not protectable. However, even when individual elements are not protectable, their "[o]riginal selection, coordination, and arrangement may be

protectable.'" *Alfred*, No. 19-55669, at *3[10]. Copyright law protects original expressions of ideas, including both literal and non-literal expressions of a work. *Peter Letterese*, 533 F.3d at 1302. Literal similarity refers to verbatim copying or paraphrasing, whereas comprehensive non-literal similarity concerns the non-literal elements of a work and is "evident where the fundamental essence or structure of one work is duplicated in another." *Id*. at 1304 n.19 (citing *Palmer v. Braun*, 287 F.3d 1325, 1330 (11th Cir. 2002)). "'[I]n many copyright cases, the line between idea and expression is not easily drawn,' and is to be determined on the totality of the facts." *Id*. at 1305 (citing *Palmer*, 287 F.3d at 1334); *see also Suntrust Bank*, 268 F.3d at 1266 ("although 'stock scenes and hackneyed character types' at one end of the spectrum are considered ideas, 'as plots become more intricately detailed and characters become more idiosyncratic, they at some point cross the line into 'expression.'").

When comparing the Works, substantial similarities in both the literal and non-literal aspects of the Novel are readily apparent in the Series. Wooten addresses each

[10] The Ninth Circuit reversed dismissal of an infringement claim that was based on the district court's conclusion that many of the similarities were unprotected, generic, pirate-movie tropes. In reversing, the court found sufficient similarities to survive dismissal where both works begin with a prologue that occurs ten years prior; introduce characters during battle; involve treasure stories that occur on islands and jewel-filled caves; include past stories of betrayal; contain fearful moments; focus on the redemption of a young, rogue pirate; and share some similarities in dialogue and tone." Similarly, here, the Novel and Series share sufficient similarities to survive a motion to dismiss.

similarity in the order in which they are discussed in Defendants' Motion.

**(i)     Plot and Sequence of Events**

As discussed, the Works are both adventure/mystery stories that follow the

protagonists[11] on their search for a long-lost, hidden treasure. Although the idea of

treasure hunting in an adventure novel is not copyrightable, Wooten's expression,

including the plot, sequence of events, characters, mood, and setting, is copyrightable.

Indeed, as the story arc, characters, and scenes develop, the treasure hunting plot evolves

from a general idea into a protectable artistic expression. To support the argument that

the Novel's plot is not protectable, Defendants handpick minor differences, ignore the

overwhelming number of similarities, and erroneously rely on a myriad of cases where

general themes were found uncopyrightable. For example, the Defendants' reliance on

*Beal* is misguided not only because the general plot of foreign rulers coming to America

to meet their wives is uncopyrightable, but because the subplot of the allegedly infringed

work involving political unrest was entirely missing from the movie, which greatly

affected the mood, thus creating a notable distinction between the works. *Beal v.*

*Paramount Pictures Corp.*, 20 F.3d 454, 461 (11th Cir. 1994). Aside from the fact that

the decision was reached at the summary judgment stage, *Beal* is distinguishable because

---

[11] Nathan, Ben, Otto, and Skipper are the protagonists of the Novel. John B., J.J., Kiara, and Pope are the protagonists of the Series.

the Series contains nearly the entire plot of the Novel. Although the Works each contain

their own minor, diverging subplots, the additional subplots do not negate or override the

substantial similarities evident when comparing the main plots of the Works.

Also, in *Beal*, the court's finding of a lack of substantial similarity as to plot turned

on "great differences in expression, as well as differences in ideas." *Id.* at 460-61. Here,

there are numerous examples of substantial similarities in the expression of ideas. For

example, both the Works are (1) set in and around the Outer Banks of North Carolina[12];

(2) involve four treasure hunters searching for hidden treasure from a fabled pirate ship[13];

(3) the protagonists are warned to stay away from a particular local waterway[14]; (4) while

SCUBA diving, the protagonists happen upon a round object[15]; (5) which contains the

first clue to the treasure[16]; (6) immediately after obtaining the round object, two armed,

mysterious, men appear, who attempt to steal the round object[17]; (7) those men terrorize

the protagonists by chasing them through a residential neighborhood[18]; (8) the clue on the

round object ultimately leads the protagonists to a mausoleum[19]; (9) at the mausoleum

---

[12] Dkt. No. 8, Affidavit, Ex. 1 at 4 and Ex. 2, Ep. 1 at 2:06.
[13] In the Novel, the pirate ship is the Queen Anne's Revenge (Ex. 1 at 3), and, in the Series, the HMS Royal Merchant (Ex. 2, Ep. 1 at 31:02).
[14] Ex. 1 at 5; Ex. 2, Ep. 1 at 37:16.
[15] Ex. 1 at 9; Ex. 2, Ep. 1 at 50:25.
[16] Ex. 1 at 10; Ex. 2, Ep. 2. at 13:01, 40:54.
[17] Ex. 1 at 11; Ex. 2, Ep. 1 at 48:24.
[18] Ex. 1 at 19, 21-22; Ex. 2, Ep. 2 at 34:24.
[19] Ex. 1 at 27-29; Ex. 2, Ep. 2 at 40:54.

they uncover additional clues to the treasure, including coordinates on a map[20]; (10)

historical portraits also play a critical role in guiding the protagonists to the treasure[21];

(11) the final clues to the treasure involve a complex combination of references to

water[22], numbers[23], and stone[24]; (12) the treasure is ultimately discovered by the

protagonists in the recess of an underground shaft[25]; (13) the protagonists leave the

treasure behind following an unexpected encounter with an armed assailant[26]; (14) the

treasure is stolen by the antagonists before the protagonists can return to extract it[27]; (15)

a co-conspirator of the rich benefactor (the villain) shoots the sheriff who attempts to stop

the treasure from being stolen[28]; and (16) the treasure is then exported internationally by

---

[20] Ex. 1 at 30, 35 (protagonists discover a clue on the wall of the mausoleum "Keep me as the apple of the eye, hide me under the shadow of thy wings.'", which leads them to a clue hidden behind an eagle carving, which turns out to contain coordinates on a map); Ex. 2, Ep. 3 at 0:16, 2:14 (protagonists discover a clue in a FedEx envelope addressed "for Bird" hidden inside the mausoleum, including a map with coordinates).

[21] Ex. 1 at 18; Ex. 2, Ep. 4 at 35:22 and Ep. 5 at 7:30.

[22] Ex. 1 at 10("*waters* shall overflow the hiding place"). Ex. 2, Ep. 5 at 7:30 ("Harvest the wheat *near the water*").

[23] Ex. 1 at 24 ("*7 right and 7 left and 7 down* to find the chest"). Ex. 2, Ep. 5 at 7:30 ("Harvest the wheat near the water *in parcel 9*").

[24] Ex. 1 at 24 ("Go through the *stone*"). Ex. 2, Ep. 6 at 4:33-4:42 (protagonists find "parcel 9" by looking for "an old stone wall," using the plat map of Tannyhill, which is found at Mrs. Crain's home).

[25] Ex. 1 at 60; Ex. 2, Ep. 6 at 45:40.

[26] Ex. 1 at 59-62; Ex. 2, Ep. 6 at 47:33.

[27] Ex. 1 at 63; Ex. 2, Ep. 8 at 27:19.

[28] Ex. 1 at 62; Ex. 2, Ep. 8 at 42:34.

private plane at the villain's direction[29]. Indeed, the main plots off the Works are nearly identical in expression and sequence.[30]

Additionally, Defendants rely on various cases from outside circuits that simply show that general themes and common scenes naturally flowing therefrom are not protectable expressions. Defendants' emphasis on such cases is misplaced because Wooten is not claiming substantial similarity solely because the Works generally involve treasure hunts and chase scenes, but because specific details relating to theme, plot, characters, scenes, mood, and pace are substantially similar in expression and sequence. *See* Compl., Ex. C.

***Pocket Watch v. Compass.*** In both the Novel and the Series, a substantially similar round object on a chain (pocket watch and compass, respectively) is discovered while SCUBA diving after the protagonists go out to sea since receiving warnings to stay out of a local waterway. Immediately after finding the round objects, two dangerous men attempt to seize the object for themselves by boat[31]. Although antagonists seeking treasure are commonplace in treasure hunt plots, the details, timing, and manner in which the antagonists appear is a substantially similar, protectable expression. The round

---

[29] Ex. 1 at 74; Ex. 2, Ep. 8 at 30:18 and Ep. 9 at 3:36.
[30] "[P]rotection covers the 'pattern' of the work…the sequence of events" *Herzog*, 193 F.3d at 1249.
[31] Ex. 1 at 11; Ex. 2, Ep. 1 at 47:55.

objects are then reinforced as clues when the protagonists discover images of prominent male figures in possession of them[32]. The clues on the round objects also lead the protagonists to mausoleums to discover additional clues. Although one may characterize the round object as a pocket watch or a compass (interestingly, neither of which are used for their utilitarian purpose), the role of the round object in both Works remains functionally and prominently the same. Additionally, the protagonists in both Works ultimately surrender the round object to compromised local sheriffs.[33]

**Mausoleum.** In both Works, the clues etched on the round objects lead the protagonists to a cemetery containing a targeted mausoleum where additional clues are discovered. In the Novel, the protagonists find a clue hidden behind the *wing* of an *eagle* carving (Ex. 1 at 30). In the Series, an envelope is discovered inside the crypt labeled "For *Bird*" with additional clues inside (Ex. 2, Ep. 3 at 0:16-2:05). The clue behind the bird statue and the clue inside the "Bird" envelope both reveal *coordinates on a map*. The authors of both Works clearly sought to invoke an avian theme at the mausoleum prior to introducing a map. In both works, the treasure hunters are chased out of the graveyard,

---

[32] Ex. 1 at 18 (portraits of North Carolina Governor Charles Eden wearing the pocket watch); Ex. 2, Ep. 2 at 12:09 (photographs of John B.'s ancestors with the compass).
[33] Ex. 1 at 26 (Otto willingly surrenders the pocket watch to Deputy Stone); Ex. 2, Ep. 2 at 36:40 (John B. willingly, albeit reluctantly, gives the compass to Sheriff Peterkin).

ending with a wardrobe mishap[34]. The events surrounding the mausoleum in the Works
are near replicas, starting with the clues on the round objects leading to the crypt, the
bird-themed clues and introduction of a map, and concluding with get-away scenes and
clothing mishaps.

   **Churches.** In both Works, the churches play an important role in furthering the
plot and sequence of events. While the Series features an old Victorian home instead of a
church, such distinction is immaterial as the scenes are still identical. Indeed, the first
church scene in the Novel (Ex. 1 at 17-18) mirrors the scene at Mrs. Crain's house in the
Series (Ep. 6 10:08), and the second church scene in the Series (Ep. 9 at 46:14) mirrors
the scene at Darwin's house in the Novel (Ex. 1 at 70). In the first visit to the church in
the Novel, Nathan and Ben search the "four cornerstones" (Ex. 1 at 17). Likewise, in the
Series, Pope suggests that they search the four corners, saying "I'll take the northeast
quadrant; you take the northwest." (Ex. 2, Ep. 6 at 9:44) The protagonists in each case
discover a small wooden door leading to the dark basement, which they enter[35]. In both
scenes, the protagonists encounter danger when, in the Novel, a "large man" attempts to
subordinate the twins (Ex. 1 at 19) and, in the Series, Mrs. Crain attempts to shoot the
protagonists. (Ex. 2, Ep. 6 at 47:33). In the protagonists' second visit to the church in the

---

[34] Ex. 1 at 31 (caretaker is caught by his jacket and leaves it behind on the fence); Ex. 2,
Ep. 3 at 1:17 (Pope's shorts get caught on the gate, which he leaves behind).
[35] Ex. 1 at 18; Ex. 2, Ep. 6 at 10:08.

Series, a fire is set inside the church (Ex. 2, Ep. 9 at 46:14), allowing John B and Sarah to escape (*Id*. Ep. 9 at 48:14). Likewise, in the Novel, Jonathon and Martha Pennywise set a fire inside Darwin's house, allowing them to escape (Ex. 1 at 70). That in both Works the protagonists and protagonists' parents, respectively, would benefit from a fire set to the building where they were trapped in order to escape their captors at a pivotal plot point is a protectable expression that cannot be dismissed as mere coincidence.[36]

***Retrieval of Treasure.*** While retrieval of treasure is a naturally flowing and unprotectable scene in any treasure hunt, the literal and non-literal details and expression of the scene that appear in both Works indicate infringement. Specifically, both treasures are found in isolated, underground shafts[37] where the protagonists' first instinct is to drop a small object to test its depth[38] and form a makeshift rappel system using ropes to lower Otto and John B, respectively, into the shaft.[39] While the idea of an alarming discovery of human skulls is often synonymous with treasure hunt stories, it is remarkable that in both Works, the only instance of such discovery occurs in relation to the shaft scene[40]. In both cases, neither skulls are tied directly to the treasure or the concealment thereof. Even

---

[36] "To be sure, there are striking differences between the two works, as well—but the selection and arrangement of the similarities between them is more than de minimis." *Disney*, 821 Fed. Appx. at 729.
[37] Ex. 1 at 60; Ex. 2, Ep. 6 at 12:34.
[38] Ex. 1 at 59 (Otto drops a coin); Ex. 2, Ep. 6 at 12:34 (Pope drops a rock).
[39] Ex. 1 at 60; Ex. 2, Ep. 6 at 40:37.
[40] Ex. 1 at 44; Ex. 2, Ep. 6 at 43:44

more telling, the treasure is further hidden in a *recess* in the shaft[41], a specific and unique location for the treasure rather than it simply being found at the bottom of the shaft. Furthermore, the protagonists in both Works are forced to leave the treasure behind due to an unexpected encounter with an armed intruder.[42] When they return to retrieve the treasure, they discover it has already been taken and the identity of the thief is revealed by a clue left behind with the thief's name on it. [43] In both Works, the Sheriff is shot by a co-conspirator of the villain when the Sheriff attempts to thwart the antagonists from stealing the treasure.[44] The treasure is then exported out of the country on a private plane at the direction of the villain.[45] Such literal similarities are impossible to ignore when they go beyond the general theme of retrieving treasure. Indeed, the literal and non-literal similarities in the manner and sequence in which the treasure is discovered, retrieved, violently fought over, unexpectedly stolen, and then transported internationally are protectable and unique expressions clearly copied from the Novel.

**Additional Similarities.** In addition to the stark examples described above, further

---

[41] Ex. 1 at 67; Ex. 2, Ep. 6 at 44:01

[42] Ex. 1 at 62 (protagonists are ambushed by Horngold, who non-fatally shoots Otto and Sheriff Spotswood with his pistol); Ex. 2, Ep. 6 at 47:33 (protagonists are ambushed by Mrs. Crain, who non-fatally shoots at them with her shotgun).

[43] Ex. 1 at 63 ("THE CHEST IS GONE!"); Ex. 2, Ep. 8 at 27:19.

[44] Ex. 1 at 62 (Sheriff Spotswood is shot by Horngold); Ex. 2, Ep. 8 at 42:34 (Sheriff Peterkin is shot by Rafe Cameron, son-turned-co-conspirator of the villain). In both cases, the sheriffs were shot while trying to stop the treasure from being stolen.

[45] Ex. 1 at 74; Ex. 2, Ep. 9 at 3:36.

examples of infringement are evidenced by the lifting of salient elements from the Novel, which bear no impact on the Series' plot. For example, in the Novel, after Horngold presents himself as U.S. Department of Homeland Security agent, Otto exclaims, "You're telling me those men were some kind of threat to *national security*?" (Ex. 1 at 12), whereas in the Series, John B exaggerates to Sarah, "It's a matter of *national security!*" (Ex. 2, Ep. 4 at 11:40), despite the story having no known national or international scope at that point. Also, in the Novel, Ben says to Nathan, in relation to their escape plan, "I was going to tell her *I sleepwalk*" (Ex. 1 at 52), whereas, in the Series, Sarah randomly says to John B, "I have to warn you: *I sleepwalk*." (Ex. 2, Ep. 6 at 1:16). Additionally, in the Novel, Nathan and Ben hitch a boat ride to Bath, a coastal town, to search for clues (Ex. 1 at 27). Similarly, in the Series, John B and Sarah hitch a boat ride to Chapel Hill to search for clues (Ex. 2, Ep. 4 at 16:40). Curiously, though, Chapel Hill is not a coastal town – it sits 150 miles inland – so the boat ride makes no sense in the Series, to which Defendants had to conjure a public explanation for the gaffe[46]. Indeed, the Series is replete with inextricable similarities like these, which, when considered in the aggregate, cannot be dismissed as inconsequential or mere coincidence.

---

[46] "Producer of Netflix's 'Outer Banks' explains geography gaffe." Associated Press, April 24, 2020, https://apnews.com/article/9416809db04f12501b022a5668225a0b

**Characters.** In addition to substantial similarities in setting, plot, sequence, dialog, and other parallels between the Works, the main characters in the Series mirror those in the Novel. The Works are both principally told through the perspective of the protagonists, and four appears to be the perfect number for a treasure hunting posse.

***Nathan and Ben v. J.B. and J.J.*** Nathan and Ben are identical twins who share a close brotherly bond, just like the Series' two main protagonists, John B. and J.J., who have been best friends since third grade (Ex. 2, Ep. 1 at 3:24) and share similar life circumstances. J.J. excitedly sings, "We are family!", suggesting a strong familial bond (*Id*. at 29:25). J.J. also observes that he and John B "got nothin' to lose" (*Id*. at 38:42), revealing their similar lot in life, in contrast to Pope and Kiara. The literal and figurative twin characteristics of Nathan and Ben compared to J.B. and J.J. are evident early on in both Works.

***Otto and Pope.*** Pope is the group member in the Series most closely aligned with Otto, as they are both uniquely characterized as skeptics and intellectuals who throw away their shot at academia[47]. Although Otto is older than Pope, this difference does not override the undeniable similarities between their academic interests and general skepticism.

---

[47] Ex. 1 at 7 (Otto is described as having "thrown away six years of college to become a treasure hunter"); Ex. 2, Ep. 1 at 4:22 (Pope is described as the "brains of the operation" and the "smartest person [John B] know[s]"); *Id*. Ep. 8 at 32:54 (Pope abandons his interview for a scholarship to pursue the treasure, throwing away his opportunity to go to college).

***Skipper and Kiara.*** Skipper and Kiara both serve as the androgynous sidekicks who act as lookouts for the group[48]. Though Skipper is a male dog, he is described as having feminine qualities in the Novel, where it states, "[W]hen it came to the boys he was as protective as a mother." (Ex. 1 at 8). Similarly, Kiara is a tomboy with both feminine and masculine traits who is fiercely protective of her friends.

***Mr. and Mrs. Pennywise and John B's Father.*** In both Works, the main characters' parents are notably absent, which plays a key role throughout the main story arc[49]. Additionally, the rich benefactors conspire to steal the treasure in part by endangering the lives of the protagonists' parent(s)[50]. In both Works, the actual harm or threat of harm to the parent(s) motivates the protagonists to act[51].

***Darwin and Ward.*** The Novel and the Series each feature a rich benefactor as the primary villain who is secretly plotting to steal the treasure. In each case, the treasure

---

[48] Ex. 1 at 8 (Martha Pennywise encourages Nathan, Ben, and Otto to take Skipper with them as a look-out on the boat, and that she "would feel a lot better if you have Skipper's eyes and ears on the boat with you"); Ex. 2, Ep. 1 at 17:18 (Kiara volunteers to serve as the "lookout" on the boat).

[49] Ex. 1 at 8 (Nathan and Ben's parents are absent because they're on a trip to Europe); Ex. 2, Ep. 1 at 5:16 (John B's father is absent due to being presumed dead or missing).

[50] Ex. 1 at 67-68 (Nathan and Ben's parents are kidnapped by Darwin and held for ransom); Ex. 2, Ep. 8 at 8:41-10:26 (J.J. suggests that John B's father may have been kidnapped, and it is later revealed that Ward nearly killed John B's father on his boat, then tossed his body into the sea).

[51] Ex. 1 at 73 (the protagonists agree to relinquish the treasure to Darwin in exchange for their parents' release); Ex. 2, Ep. 8 at 8:41-10:26, 15:47 (John B determines that Ward killed his father, prompting John B to "come for" Ward (Ex. 2, Ep. 10 at 45:09)).

represents what the rich men crave most in the world: for Darwin, it's more power (Ex. 1 at 69), and for Ward, it's $400 million in gold (Ex. 2, Ep. 1 at 31:02). Although rich benefactors seeking treasure is an unprotectable idea, it is the literal similarities in the manner in which these two villains obtain the treasure, including their use of corrupt law enforcement, the two unknown dangerous men, and their willingness to kidnap and murder that are protectable expressions.

**Deputy Stone and Sheriff Peterkin.** Both Works prominently feature compromised local law enforcement officials who are secretly working to thwart the protagonists' treasure hunt[52].

Lastly, virtually all of the above characters in both Works rely heavily on their experience to commandeer saltwater speed boats, weather dangerous storms, and navigate the coastal waterways of North Carolina to guide them throughout the story.

(ii)   **Mood**

Defendants argue that the subplots in the Series, which are absent from the Novel, greatly affect the mood of the Series and further distinguish it from the Novel. However, the Series' love triangles and rivalries among the characters are merely incidental, as the

---

[52] Ex. 1 at 26 (Deputy Stone was ordered by his "employer" to "eliminate" anyone who was "getting close to finding the treasure"); Ex. 2, Ep. 5 at 10:26, 33:28 (after Sheriff Peterkin convinces John B to surrender the compass to her, she then covertly turns it over to Ward).

primary plot is still the treasure hunt, and such subplots in the Series merely enhance the mood of the primary plot, which is substantially similar in expression to the Novel.

Additionally, the Defendants' reliance on *Beal* to support the argument that the moods of the Works are dissimilar is misplaced because *Beal* involved a serious book with political and romantic overtones, while the allegedly infringing movie was a comedy. *Beal*, 20 F.3d at 461. In contrast, here, the moods of both Works start out as light-hearted, summer adventures that quickly take a dark turn when the treasure hunt begins. Contrary to Defendants' position, the Novel also includes scenes filled with tension, suspense, and violence[53]. The fact that the Series, but not the Novel, portrays teens using drugs is largely immaterial and does not affect the overarching similarities in overall mood, pace, and plot, nor does it create any meaningful distinction between the Works in a substantial similarity analysis.

---

[53] Various examples of tension, suspense, and violence in the Novel include scenes where Nathan and Ben are chased by the mysterious, armed men from the church (Ex. 1 at 19); Deputy Stone attempting to "eliminate" Nathan and Ben by causing a gas leak in their home ( *Id.* at 26); Deputy Stone kidnapping and imprisoning Sheriff Spotswood and Jack (*Id.* at 44); Sheriff Spotswood being bound and gagged (*Id.* at 53); Horngold imprisoning Otto, Nathan, and Ben in the engine compartment of their boat (*Id.* at 43) and shooting holes in the hull in an attempt to drown them (*Id.* at 45); Horngold threatening the protagonists in the cave with a pistol, shooting Otto in the hip and Sheriff Spotswood in the thigh (*Id.* at 59-62); Horngold threatening to slice Nathan's throat with a knife (*Id.* at 61); Darwin's agents imprisoning the Pennywises against their will (*Id.* at 69); Pennywises setting fire to the basement in an attempt to escape and likewise threatening to set the guard on fire (*Id.* 70); and Mr. Pennywise shooting his would-be captor in the right foot (*Id.* at 71).

(i)    **Setting**

Defendants allege that the settings in the Works differ because the protagonists in the Novel travel to the United Kingdom and Israel. The Defendants erroneously ignore that the primary setting of the Novel still remains in and around the Outer Banks of North Carolina. The protagonists in the Novel only arrive in Great Britain in Chapter 20 out of 22, with Otto traveling to Jerusalem only in the very last paragraph of the last page, as a sort of epilogue. Indeed, the Novel's original setting, the clues, the majority of the plot, and the treasure itself are all located in and around the Outer Banks and surrounding areas. Likewise, the Series occurs in and around the coastal region of the Outer Banks, including a side quest to Chapel Hill, with the final scene ending with Sarah and John B setting off into international waters to Nassau, Bahamas. (Ex. 2, Ep. 10 at 53:07). Regardless of the characters' limited travels, both Works center largely on the Outer Banks area of North Carolina, which such specific location part and parcel of a unique and protectable expression that goes beyond an unprotectable general theme such as a "small rural town". *See Herzog*, 193 F.3d at 1257.

**(iii)    Pace**

Defendants admit that both of the Works are fast paced, which is typical in the adventure genre. Indeed, the Works each feature significant plot developments in the first chapter or episode, and the pace of developments does not slow down at any point in

either Work. Wooten agrees that the pace is common for an adventure novel; however, it is the expression of the pace that is protectable and apparent in both Works.

As stated above, substantial similarity exists when the average lay observer would recognize that the Series has misappropriated the Novel. Given the numerous literal and non-literal similarities between the Works, such as plot, scenes, characters, and settings, this Court should find that the Series merely renames the characters and settings and adopts, almost verbatim in some instances, scenes contained in the Novel. Additionally, although Defendants admonish Wooten for a "cherry-picked list of random 'similarities'", the Defendants also engage in hand-picking differences without regard to the overwhelming similarities in expression and sequence. Thus, the average lay observer would determine that the Series is substantially similar to the Novel.

## C. __Attorney's Fees__

Wooten voluntarily requests this Court to dismiss his claim for attorney's fees as set forth in the prayer of the Complaint. This dismissal does not impact any other claims. Accordingly, Wooten asks this Court to dismiss its claim for attorney's fees and requests leave of court to amend the Complaint to remove this claim appropriately

## D. __Punitive Damages__

Defendants seek dismissal of Wooten's claims for punitive damages under O.C.G.A. § 13-6-11. While punitive damages may not be recoverable under the Georgia

statute, they are in fact recoverable under the Copyright Act. Although it is well settled law that punitive damages are denied when seeking statutory damages, punitive damages may be awarded in cases seeking actual damages where the Defendants acted with malice. "Where the contemplated award is actual damages plus profits, such a recovery is compensatory only and does not address the interests of deterrence and punishment that are reflected in the principles underlying both punitive damages and statutory damages for willful infringement." *TVT Records v. Island Def Jam Music Group*, 262 F. Supp. 2d 185, 186 (S.D.N.Y. 2003) (holding that the plaintiff's claims for punitive damages for copyright infringement found to be willful are not precluded as a matter of law).[54] Thus, Wooten requests leave to amend the complaint to seek punitive damages under the Copyright Act.

## IV.   <u>Conclusion</u>

For the foregoing reasons, Defendants' motion to dismiss should be denied because Wooten's copyright claims satisfy all pleading requirements, and it is premature to determine substantial similarity between the Works prior to discovery.

---

[54] "The logical circumstance in which such damages would be available, provided the requisite malice is indicated, is in cases such as this one where the available damages exclude statutory damages, or where actual damages plus profits are available as an alternative to statutory damages" *Id*. at 187.

Respectfully submitted this 29th day of March 2021.

/**Marcy L. Sperry**/
Marcy L. Sperry, Esq.
Georgia Bar No. 455561
marcy@vividip.com
Melissa F. Castro, Esq.
Georgia Bar No. 384781
melissa@vividip.com
Sperry IP Law d/b/a Vivid IP
3017 Bolling Way, NE
Atlanta, Georgia 30305
(404) 474-1600

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to L.R. 5.1B and 7.1D of the Northern District of Georgia, that the foregoing *Response to Defendants' Motion to Dismiss* complies with the font and point selection in accordance with L.R. 5.1B and was prepared using 14-point Times New Roman font.

<u>/Marcy L. Sperry/</u>
Marcy L. Sperry, Esq.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of March 2021, I electronically filed the foregoing *Response to Defendants' Motion to Dismiss*, with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

<u>/Marcy L. Sperry/</u>
Marcy L. Sperry, Esq.