IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KEVIN WOOTEN,

     Plaintiff,

v.

NETFLIX, INC.;
DANIEL S. BURKE;
JONAS J. PATE; and
JOSHUA W. PATE,

     Defendants.

CIVIL ACTION FILE

NO. 1:20-cv-5166-TCB

## <u>O R D E R</u>

This case comes before the Court on the motion [7] to dismiss filed

by Defendants Netflix, Inc; Daniel S. Burke; Jonas J. Pate; and Joshua

W. Pate.

## I.   Background

Plaintiff Kevin Wooten is a high school English teacher in

Wilmington, North Carolina. He is also the author of *Pennywise: The*

*Hunt for Blackbeard's Treasure!* ("the novel"), which was published on

May 8, 2016, and registered with the United States Copyright Office on September 10, 2020.[1] Since 2016, he has advertised the novel online and in local North Carolina stores.

On April 15, 2020, Defendant Netflix, Inc. released season one of its *Outer Banks* television show. The individual Defendants are the show's creators.

Wooten alleges that Defendants infringed upon his copyright by copying certain protected elements of his novel.

To adjudicate a copyright dispute of this kind, a court must undertake a detailed comparison of the works. *See Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 456 (11th Cir. 1994) (internal citations omitted). The Court has reviewed both works and begins by briefly summarizing them below.

**A.    The Novel**

The novel begins *in media res* with twin brothers Nathan and Ben Pennywise living in Beaufort, North Carolina, near where the pirate

---

[1] Copyright registration number TX 8-894-119.

Blackbeard purportedly died. Together with their uncle, Otto Burns, they embark on a treasure hunt and discover a pocket watch inscribed with Biblical verse.

What follows is an adventure tale that intertwines pirate lore with the legend of the Holy Grail. The novel suggests that Blackbeard traveled to South Carolina in the 1600s with a chest containing the Grail, a lock of Jesus' hair, his baby clothes, and other religious artifacts tied to Jesus' childhood. The twins and their uncle Otto—aided by the local sheriff—attempt to find the chest before a mysterious character named Darwin can do so. Darwin, they learn, intends to DNA-test the artifacts to dispel the notion of divine creation. Otto, a devout Christian, hopes to stop him. He also aims to rescue his sister and her husband (the twins' parents), who were abducted by Darwin as leverage to obtain the artifacts.

Ultimately, Otto and the twins successfully discover Blackbeard's chest in the depths of a cave. But they fail to safeguard its artifacts; Otto is instead duped into handing them over to an individual who he believes works for the British government but who turns out to be an

3

agent of Darwin. Although the twins' parents manage to escape, the novel concludes with the expectation that Jesus' humanity will be revealed.

### B.    The Series

Netflix's *Outer Banks* follows four troublemaking teenagers—John B, Pope, Kiara, and J.J.—as they navigate family strife and class conflict in the Outer Banks of North Carolina.

The series begins with the four teenagers drinking beers and trespassing at a nearby home. During a subsequent boat excursion, the group happens upon a sunken speedboat with a compass that belonged to John B's father. After following a series of clues, the group learns that John B's father, who went missing during a treasure hunt for a famed shipwreck in the area, had located the treasure only to be killed by a wealthy local developer named Ward.

The four teens follow clues left behind by John B's father and find the treasure beneath an elderly neighbor's home. Before they can remove it, however, it is stolen by Ward, who aims to start a new life in the Bahamas with his children. Ward is awaiting his Bahamian plane

when his son fatally shoots a local sheriff attempting to arrest Ward for the murder of John B's father. John B is framed for the sheriff's murder and goes into hiding. Season one of the series concludes with John B's harrowing escape from the island by boat with his girlfriend.

### C.   Procedural History

On December 21, 2020, Wooten filed this suit. He brings one claim of copyright infringement and additional claims for attorney's fees and punitive damages under Georgia law. On March 1, 2021, Defendants moved to dismiss. They argue that because the novel is not substantially similar to *Outer Banks*, they cannot be held liable for copyright infringement as a matter of law.

## II.   Legal Standard

To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1199 (11th Cir. 2012) (quoting *id.*). The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads
> factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted) (quoting *Twombly*, 550 U.S. at 556); *see also Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324–25 (11th Cir. 2012).

Thus, a claim will survive a motion to dismiss only if the factual allegations in the complaint are "enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555–56 (citations omitted). "[A] formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). While all well-pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff, *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011), the Court need not accept as true the plaintiff's legal conclusions, including those couched as factual allegations, *Iqbal*, 556 U.S. at 678.

## III.  Discussion

"To establish copyright infringement, two elements must be proven: ownership of a valid copyright, and copying of constituent

elements of the work that are original." *Beal*, 20 F.3d at 459 (internal citations omitted).

A certificate of registration indicating a valid copyright is attached to Wooten's complaint. While such certificates are not conclusive evidence of a copyright, they "constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c); *see also Progressive Lighting, Inc. v. Lowe's Home Ctrs., Inc.*, 549 F. App'x 913, 918 (11th Cir. 2013). And Defendants do not argue that Wooten lacks a valid copyright. Accordingly, the Court will assume for purposes of this motion that Wooten has a valid copyright and will consider only whether *Outer Banks* copied original elements of the novel.

## A.    Appropriateness of 12(b)(6) Dismissal

There is no allegation of direct copying here. Therefore, Wooten's ability to recover depends upon whether *Outer Banks* is substantially similar to his novel.[2] *See Original Appalachian Artworks, Inc. v. Toy*

---

[2] Wooten must also show that Defendants had access to the copyrighted work. *See Oravec v. Sunny Isles Luxury Ventures, LC*, 527 F.3d 1218, 1223 (11th Cir. 2008). For purposes of this motion, however, Defendants do not challenge

*Loft, Inc.*, 684 F.2d 821, 829 (11th Cir. 1982) (internal citations omitted) (finding that where direct proof of copying is lacking, a plaintiff must show that the defendant's work is substantially similar to the plaintiff's protected work). In other words, the Court asks whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Oravec*, 527 F.3d at 1224 (quoting *Original Appalachian*, 684 F.2d at 829).

Defendants argue that a court may decide substantial similarity at the pleading stage if the works at issue are "incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007)). Courts outside of this circuit have found it appropriate to do so because "no discovery or fact-finding is typically necessary" and "'what is required is only a

---

access. They need not do so to prevail on their motion; in the Eleventh Circuit, lack of substantial similarity is fatal to a copyright infringement claim even where there is proof of access. *See Dream Custom Homes, Inc. v. Modern Day Constr., Inc.*, 476 F. App'x 190, 192 (11th Cir. 2012).

visual comparison of the works.'" *Id.* (quoting *Folio Impressions, Inc. v. Byer Cal.* 937 F.2d 759, 766 (2d Cir. 1991)).

While the Eleventh Circuit has not expressly held the same, it has confirmed that

> the "substantial-similarity" test is more often correctly administered by a judge rather than a jury—even one provided proper instruction. The reason for this is plain—the ability to separate protectable expression from non-protectable expression is, in reality, a question of law or, at the very least, a mixed question of law and fact.

*Intervest Constr., Inc. v. Canterbury Est. Homes, Inc.*, 554 F.3d 914, 920 (11th Cir. 2008). And lower courts within this circuit have examined substantial similarity at the motion-to-dismiss stage, reasoning that to do so is appropriate because the analysis requires only an examination of the works in question. *See Sieger Suarez Architectural P'ship, Inc. v. Arquitectonica Int'l Corp.*, 998 F. Supp. 2d 1340, 1350 (S.D. Fla. 2014); *Marquardt v. King*, No. 1:10-cv-3946-JEC, 2011 WL 5042054, at *7–8 (N.D. Ga. Aug. 10, 2011). The Court agrees with this reasoning and therefore will consider whether the two works are so dissimilar that dismissal is warranted.

9

## B.   Substantial Similarity Test

"Not all copying constitutes infringement." *Oravec*, 527 F.3d at 1224 (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). While "original elements of expression" are protectable, generalized themes or "ideas are not." *Singleton v. Dean*, 611 F. App'x 671, 672 (11th Cir. 2015) (per curiam) (citing 17 U.S.C. § 102(b)). Thus, while the classic concept of a treasure hunt would not be copyrightable, if the treasure hunt theme in one work were expressed in a substantially similar manner as in an earlier work, then a claim for copyright infringement may lie. *See Beal v. Paramount Pictures*, 806 F. Supp. 963, 966 (N.D. Ga. 1992) (explaining that the basic boy-meets-girl premise would not be protectable but that infringement might occur "if there were substantial similarity in the expression of th[at] general theme").

Also unprotectable are any scènes à faire, or "stock scenes that naturally flow from a common theme." *Singleton*, 611 F. App'x at 672 (citing *Beal*, 20 F.3d at 459–60); *see also DuBay v. King*, 844 F. App'x 257, 265 (11th Cir. 2021) (holding that the "doctrine of 'scene-a-faire'

teaches that elements of a work that are 'indispensable, or at least standard, in the treatment of a given topic'—like cowboys, bank robbers, and shootouts in stories of the American West—get no protection" (quoting *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 102 (2d Cir. 2014))); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) (finding that noncopyrightable material in a fictional police drama includes "[f]oot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop"); *Evans v. Wallace Berrie & Co.*, 681 F. Supp. 813, 817 (S.D. Fla. 1988) (concluding that in a fictionalized underwater society, "[s]uch similarities as using a sand dollar as currency, foods made of seaweed, seahorses for transportation and plates made of oyster or mother of pearl" are unprotectable "characterizations that naturally follow from [a] common theme").

Once any generalized ideas and scènes à faire are disregarded, the infringement analysis asks whether the protected expression of ideas in the two works is substantially similar. *See Vallejo v. Narcos Prods. LLC*, 833 F. App'x 250, 257 (11th Cir. 2020) (per curiam) (citing *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 843

(11th Cir. 1990)). To determine whether one form of expression is substantially similar to another, the Eleventh Circuit has advised courts to consider such categories as "plot, characterization, mood, pace, and settings." *Marquardt*, 2011 WL 5042054, at *3 (quoting *Beal*, 806 F. Supp. 963 at 967–69).

## C.   Application of Test

Wooten identifies forty-six alleged similarities between the two works. The Court has examined all of the purported similarities, including the plot devices in conjunction with one another. Because it would be "neither useful nor judicious to detail each and every one," *Beal*, 20 F.3d at 460, the Court will instead analyze in detail the most significant of the claimed similarities.

As a preliminary matter, many of Wooten's purported similarities either do not exist or are "random similarities" that "could be found in very dissimilar works." *Beal*, 20 F.3d at 460 (quoting *Beal*, 806 F. Supp. at 967 n.2). For instance, he argues that "both Works clearly sought to invoke an avian theme at the mausoleum." [19] at 14. He points out that in his novel, Nathan and Ben find a clue hidden in the wing of a

bird statue at a mausoleum. He argues that this plot device is substantially similar to the protagonists' discovery in *Outer Banks* of a clue labeled "For Bird." But the bird reference in *Outer Banks* is merely a callback to the nickname John B's father gave him as a child. The fact that the word "bird" is present in both narratives is entirely innocuous and of no significance in an infringement analysis.

Wooten also highlights the repetition of certain words in both works. In the novel, for instance, Otto incredulously asks whether that two men following his boat were "some kind of threat to national security." K.W. Wooten, *Pennywise: The Hunt for Blackbeard's Treasure!* 19 (2016). In the series, John B jokes to his girlfriend that "it's a matter of national security" when trying to deflect her question about his whereabouts. These phrases arise in entirely unrelated contexts and likewise do not give rise to a copyright infringement claim.

And finally, Wooten alleges that in both works the "protagonists visit an old wooden church, twice" and "discover[] a small, wooden door leading to the dark basement." [1-3] at 4. But in the series, the protagonists' church visits are unrelated to their discovery of a

basement door. Indeed, as Wooten acknowledges, the discovery of a basement door in the series occurs in "an old Victorian home instead of a church." [19] at 15. Wooten's allegation that similar events occur in the two works is plainly erroneous and does not entitle him to copyright protection.

Separately, many of Wooten's purported similarities are unprotectable scènes à faire. For instance, he highlights that both works involve chases through mausoleums or graveyards, the retrieval of treasure from a deep shaft, and the discovery of clues in old portraits. But each of these events "naturally arise[s] from the generalized theme of" a treasure hunt. *Beal*, 806 F. Supp. at 967. They are classic scènes à faire and therefore are not copyrightable.

Having disregarded any unprotectable elements, the Court now considers whether the protected elements of the two works are substantially similar. As noted above, an examination of the works' plot, characterization, mood, pace, and setting guides this analysis. The Court will consider each in turn.

### 1.    Plot

The plots of the novel and the film differ significantly. To be sure, both works involve shipwrecks and treasure hunts. But to analyze their plots at such a high level of abstraction would render every work involving a hunt for buried treasure susceptible to copyright infringement. In the novel, the protagonists search for Blackbeard's chest because it contains the Holy Grail. The goal of their Grail quest—which involves interpreting clues hidden in Biblical verse—is not to obtain wealth, but to safeguard a sacred relic.

The plot of Defendants' work bears no resemblance to this religious narrative. In *Outer Banks*, four close-knit teenagers drink, cause trouble, and run from authorities in their seaside town. Much of the plotline is devoted to the four protagonists' troubled parental relationships; John B's desire to find his missing father, for instance, is what initially compels them to follow a series of clues about a shipwreck. Once they embark upon their treasure hunt, they become hyper-focused on finding the gold to enrich themselves and escape their

lives of poverty. The plots of the two works are therefore highly dissimilar.

Moreover, numerous subplots are littered throughout *Outer Banks*. John B falls in love with Ward's daughter; Pope falls in love with Kiara; J.J. is abused by his drunken father; and Ward's son descends into drug addiction. The novel lacks any clear subplots.

### 2.   Characterization

The protagonists in the two works also share few similarities, even when painted with the broadest brush. The novel is centered around a triumvirate comprised of middle-school-age twins Nathan and Ben and their uncle Otto, a former academic turned notable treasure hunter. The twins are characterized by their naiveté and deference to authority—they plead with their parents to permit them to spend time with Otto and later plead with Otto to let them help find Blackbeard's chest.

The four teenagers in *Outer Banks*, on the other hand, are notorious for their independence and for causing trouble. The series opens with their escape from police after trespassing on private

property while drinking beer, and subsequent episodes depict them in fistfights and evading law enforcement. A central tenet of these characters is their rebellion from authority. These are crucial dissimilarities between the two works.

Wooten also asserts that the works' primary antagonists are substantially similar. While it is true that both demonstrate a willingness to commit murder to achieve their desired goals, the similarities stop there. Darwin, the novel's primary antagonist, is motivated by his desire to dispel the notion of divine creation and orders others to commit murder on his behalf. There is little development of his character in the novel—he appears only as an anonymous figurehead intent upon achieving his aim. On the other hand, Ward is the father of John B's girlfriend and his employer. His character is well-developed and complex—he is shown caring deeply for his children, for instance, but is also depicted killing John B's father out of greed.

A comparison of the works' ancillary antagonists fares no better. In the novel, Darwin operatives feign assistance to the twins and Otto before betraying them to Darwin. Wooten argues their actions are

17

substantially similar to those of Sheriff Peterkin in *Outer Banks*. But the characterization of Peterkin is quite different. While she does attempt to detain John B, she feels compelled to do so because he is without a parental guardian. She does not act out of her own self-interest and indeed, ultimately helps investigate the murder of John B's father before she is killed in the line of duty by Ward's drug-crazed son.

In sum, the characterization in the novel is in stark contrast to that of the series. The *Outer Banks* characters are complex, with narratives that cause the viewer to at times sympathize with even the most nefarious individuals. In the novel, on the other hand, the naïve Pennywise twins and their uncle serve as prototypical hero figures while Darwin acts as a classic villain.

### 3.   Setting

The Court recognizes that both works are principally set on the shores of North Carolina. But that broad similarity is not subject to copyright protection, *see Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1257 (11th Cir. 1999), and the details within the two settings vary widely. For instance, the twins in *Pennywise* live in Beaufort and travel

18

to various neighboring towns. The treasure is located offshore on a different island. And the setting does not function as a plot device—it reflects Blackbeard lore about his final resting place, but the location itself does not further the storyline.

By contrast, the *Outer Banks* series is principally driven by class conflict in the community, which is divided by neighborhood between the wealthy Kooks and the impoverished Pogues. The protagonists are defined by their identities as Pogues and are driven to find the treasure so that they might transform themselves into Kooks.

To further the series' focus on social divisions, the *Outer Banks* setting depicts—in considerable detail—the elaborate home of John B's Kook girlfriend, the protagonists' run-down residences, and Kiara's family restaurant (which serves as a conduit between the two worlds). Thus, it functions not only as an intricate backdrop for the storyline but also as a plot device that furthers the class-conflict narrative.

### 4.   Mood and Pace

The works also vary greatly in their mood and pace. The plot of the novel is fast-paced, covering the twins' journey with Otto to find

Blackbeard's chest and travel to Europe to save their parents in just one week. And its language is succinct—in just ten pages, the twins and Otto discover Blackbeard's grave and learn that his chest contains the Holy Grail.

*Outer Banks*, on the other hand, takes place over the course of a summer. Its pace develops more slowly. For instance, the murder of Sheriff Peterkin by Ward's son occurs only after significant character development centered around the son's drug addiction. And the final episode of the series is devoted solely to John B's escape from the island after being framed for Peterkin's murder. Contrast his lengthy escape to the single paragraph of the novel devoted to the twins' parents' escape from Darwin and the variation in the two works is clear.

The mood of the series is also demonstrably darker than that of the novel. In *Outer Banks*, the characters use drugs, drink alcohol while underage, and flirt with teenage promiscuity. Further darkening the series' mood are graphic depictions of violence and domestic abuse. The novel hints at moments of tension and violence but does not describe them in any detail. Its overall tone is far less intense.

### D.   Combined Similarities

As a final matter, Wooten argues that even if certain elements of the works are unprotectable standing alone, the combination of elements in his novel constitutes a protectable expression. *See* [19] at 10 ("Although the idea of treasure hunting in an adventure novel is not copyrightable, Wooten's expression [of those ideas] . . . is copyrightable.").

In some circuits, the combination of otherwise unprotectable elements may itself be copyrightable if the sequence of events is substantially similar in the two works. *See Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1074 (9th Cir. 2020); *Salinger v. Random House, Inc.*, 811 F.2d 90, 98 (2d Cir. 1987). However, the Eleventh Circuit has not adopted such an approach. *See Latele Television, C.A. v. Telemundo Commc'ns Grp.*, No. 12-22539-CIV, 2015 WL 427817, at *7 (S.D. Fla. Feb. 2, 2015).

Even if it had, the unprotectable elements in Wooten's novel are not so original that a combination of them would constitute an original work of authorship. *See Skidmore*, 952 F.3d at 1074 (extending

21

copyright protection to only those combinations of unprotectable elements that are "numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship" (quoting *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003))). Numerous works have depicted the Blackbeard fable. *See Pirates of the Caribbean: On Stranger Tides* (Walt Disney Pictures 2011); *Secrets of the Dead: Blackbeard's Lost Ship* (Public Broadcasting Service 2009); and Tim Powers, *On Stranger Tides* 1 (1987). Even more have reimagined the quest for the Holy Grail. *See* Dan Brown, *The Da Vinci Code* (2003); *Indiana Jones and the Last Crusade* (Paramount Pictures 1989); *Monty Python and the Holy Grail* (Python (Monty) Pictures Limited 1975); T.S. Eliot, *The Waste Land* (1922); and Chrétien de Troyes, *Le Conte du Graal* (1180). The combination of Blackbeard lore with the legend of the Holy Grail—accompanied by traditional plot devices for these themes—is not so original that the arrangement is protected by copyright law from another treasure-hunting narrative with a select few similar scenes that appear in countless works. *See Herzog*, 193 F.3d at 1248 (internal

22

citations omitted) ("Incidents, characters, or settings that are indispensable or standard in the treatment of a given topic are not copyrightable.").

Based on the foregoing, no reasonable lay observer would recognize *Outer Banks* as being derivative of Wooten's novel. Accordingly, count I for copyright infringement is due to be dismissed.

### E.   Derivative Claims

In briefing, Wooten abandons counts II and III for attorney's fees and punitive damages under Georgia law. Instead, he seeks leave to amend his complaint to assert a claim for punitive damages under the Copyright Act.

A plaintiff seeking damages for copyright infringement can elect to pursue either actual damages plus profits or statutory damages. 17 U.S.C. § 504(a). Generally, courts have as a result found it inappropriate to award punitive damages. *See On Davis v. Gap, Inc.*, 246 F.3d 152, 172 (2d Cir. 2001) (reasoning that "[t]he purpose of punitive damages—to punish and prevent malicious conduct—is generally achieved under the Copyright Act through the provisions of 17

U.S.C. § 504(c)(2), which allow increases to an award of statutory damages in cases of willful infringement"). While at least one district court in New York has found differently, *see TVT Records v. Island Def Jam Music Group*, 262 F. Supp. 2d 185, 188 (S.D.N.Y. 2003), "prevailing case law is clear that punitive damages are not available" under the Copyright Act. *Calio v. Sofa Express, Inc.*, 368 F. Supp. 2d 1290, 1291 (M.D. Fla. 2004) (citing *On Davis*, 246 F.3d at 172, and *Budget Cinema, Inc. v. Watertower Assocs.*, 81 F.3d 729, 733 (7th Cir. 1996)); *see also White v. Alcon Film Fund, LLC*, No. 1:13-cv-1163-TCB, 2013 WL 12067479, at *7 (N.D. Ga. Aug. 13, 2013) (finding that "[i]rrespective of whether a plaintiff is seeking actual or statutory damages, punitive damages are not available under the Copyright Act" (quoting *Granger v. Gill Abstract Corp.*, 566 F. Supp. 2d 323, 330 (S.D.N.Y. 2008))); *Dombrowsky v. Hill*, No. 1:11-cv-3048-MHS, 2013 WL 12100113, at *12 n.8 (N.D. Ga. July 23, 2013).

Accordingly, Wooten's request for leave to amend his damages claim is futile.

## IV.   Conclusion

As the Eleventh Circuit has aptly put it, "[i]f the similarities in general ideas and scenes a faire serve to show anything at all, perhaps it is only that 'in Hollywood, as in [life] generally, there is only rarely anything new under the sun.'" *Beal*, 20 F.3d at 464 (quoting *Berkic v. Crichton*, 761 F.2d 1289, 1294 (9th Cir. 1985) (alteration in original), and citing *Ecclesiastes* 1:9 ("[T]here is no new thing under the sun.")).

Having found that the two works here are not substantially similar as a matter of law, Defendants' motion [7] to dismiss is granted with prejudice.[3] The Clerk is directed to close this case.

IT IS SO ORDERED this 25th day of May, 2021.

Timothy C. Batten, Sr.
Chief United States District Judge

---

[3] The Court grants the motion with prejudice because Wooten does not seek leave to amend his substantive claim and because a thorough examination of the works shows that no amount of repleading could alter the outcome here.